[No. D048175. Fourth Dist., Div. One. June 14, 2007.]

THE PEOPLE, Plaintiff and Respondent, v.
JAMES E. WESTBROOKS, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION[1]]**

---

[1] Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of part III.B.

COUNSEL

Patricia L. Brisbois, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Mary Jo Graves, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Peter Quon and Pat Zaharopoulos, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

AARON, J.—

## I.

## INTRODUCTION

A jury found James E. Westbrooks guilty of selling a controlled narcotic substance, cocaine base (Health & Saf. Code, § 11352, subd. (a)) (count 1). The jury also found that Westbrooks sold cocaine base within the meaning of Penal Code section 1203.073, subdivision (b)(7).[2] After the jury returned its verdict, Westbrooks admitted that he had served two prior terms in prison and that he had suffered a prior strike conviction. The trial court sentenced Westbrooks to eight years in prison, after striking the two prison priors and doubling the middle term of four years based on his strike prior.

On appeal, Westbrooks claims that by instructing the jury pursuant to Judicial Council of California Criminal Jury Instructions (2006) CALCRIM No. 220, the trial court violated his due process right to have his guilt determined beyond a reasonable doubt. Westbrooks argues that the instruction improperly informed the jury that it could not consider the lack of physical evidence implicating him in the crime in determining whether the People met their burden of proving him guilty beyond a reasonable doubt. Westbrooks also claims that the trial court erred in refusing to strike his prior strike conviction.[3] We affirm the judgment.

---

[2] Unless otherwise specified, all subsequent statutory references are to the Penal Code.

[3] We consider this contention in the unpublished portion of this opinion.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *Factual background*

1. *The People's evidence*

On November 17, 2005, at approximately 5:00 p.m., San Diego Police Detective Jesse Zaldivar was working undercover in the area of 15th and J Streets looking for potential drug dealers from whom to purchase cocaine base. Detective Zaldivar was wearing a "body wire," or one-way transmitter, that allowed him to transmit audio signals to other police officers who were monitoring his activities.

Detective Zaldivar saw a man wearing a red jacket and black sweatpants with a yellow stripe, later identified as codefendant Melvin Mitchell. Detective Zaldivar asked Mitchell if Mitchell was selling cocaine base and told Mitchell that he was looking to buy $20 worth of cocaine base. Mitchell told Zaldivar to follow him. Mitchell and Zaldivar walked about 30 feet, until they encountered a man later identified as Westbrooks. Mitchell asked Westbrooks if he had $20 worth of cocaine base. Mitchell told Westbrooks that Zaldivar was a friend.

Westbrooks asked Zaldivar if he was a police officer, and Zaldivar replied that he was not. Westbrooks reached into the right pocket of his shorts and pulled out a piece of plastic that contained an off-white "rocklike" substance. Westbrooks took a single piece of the rocklike substance and placed it in Zaldivar's hand. Zaldivar then gave Westbrooks a $20 bill.[4]

San Diego Police Officer Vernon Peterson, who was monitoring Zaldivar's activities, heard Zaldivar give a signal over the wire indicating that he had purchased a controlled substance. Officer Peterson informed other police officers, who were responsible for arresting the suspects, of the completed transaction.

After the sale, Westbrooks walked northbound. Detective Zaldivar walked with Mitchell about 20 feet, until police officers in two marked patrol cars drove up next to Zaldivar and Mitchell. One officer stopped his vehicle and detained Mitchell. Detective Zaldivar pointed north, to advise the second officer, San Diego Police Officer Jose Chavez, of Westbrooks's whereabouts.

---

[4] The parties stipulated that the substance sold was cocaine base weighing 0.27 gram.

Officer Chavez continued driving in an attempt to locate Westbrooks. Moments later, Zaldivar got into another police car that was being driven by Sergeant Griffin. Detective Zaldivar broadcast a description of the suspect to the arrest team over the police radio. Zaldivar stated that the suspect was a Black male wearing a black T-shirt and black shorts.

Officer Chavez heard the radio broadcast describing Westbrooks.[5] After driving a few blocks, Officer Chavez saw Westbrooks and arrested him. Sergeant Griffin drove Zaldivar to the location of Westbrooks's arrest. Within three minutes of the original purchase, Detective Zaldivar identified Westbrooks as the person who had sold him the cocaine base.

Officer Chavez searched Westbrooks, but did not find any $20 bills or any rock cocaine. Officer Chavez searched the area, but found no additional evidence.

### 2. *Defense evidence*

Heirrieze Arnwine, a certified addiction treatment specialist and a friend of Westbrooks's wife, testified that she had agreed to meet with Westbrooks at a program called the Lighthouse at 5:30 p.m. on the evening of November 17, 2005. The Lighthouse is a residential treatment program for male parolees, and is located in the area where Westbrooks was arrested. Westbrooks did not show up for their scheduled meeting.

Dr. Thomas MacSpeiden, a forensic psychologist, testified as an expert regarding eyewitness identification. MacSpeiden discussed factors that are known to affect the accuracy of an eyewitness's identification, including stress and the presence of a weapon. MacSpeiden also testified that police officers are, in general, no more able to identify a face than are other persons.

### 3. *Rebuttal evidence*

Detective Zaldivar testified that he took steps to ensure that he would be able to correctly identify Westbrooks, including describing him to other police officers over the wire he was wearing and confirming Westbrooks's identity approximately two and a half minutes after he purchased the rock cocaine. Detective Zaldivar testified that there was no weapon directed at him during the purchase and that at the time of the purchase, he was not experiencing stress that might prevent him from being able to identify the person who had sold him the drugs.

---

[5] Officer Chavez testified that he "believed" that the broadcast came from Sergeant Griffin.

## B. *Procedural Background*

In December 2005, the People filed an information against Westbrooks and codefendant Mitchell. The People charged Westbrooks with selling a controlled narcotic substance, cocaine base (Health & Saf. Code, § 11352, subd. (a)) (count 1), and possessing cocaine base for sale (Health & Saf. Code, § 11351.5) (count 2). With respect to count 1, the People alleged that Westbrooks had sold cocaine base within the meaning of section 1203.073, subdivision (b)(7). With respect to both counts, the People alleged that Westbrooks had suffered a prior conviction within the scope of Health and Safety Code section 11370, subdivision (a).[6]

The People further alleged that Westbrooks had suffered three felony convictions within the meaning of section 1203, subdivision (e)(4), that he had served two prior prison terms within the meaning of sections 667.5, subdivision (b) and 668, and that he had suffered a prior strike conviction within the meaning of sections 667, subdivisions (b) through (i), 1170.12 and 668.

A jury found Westbrooks guilty of selling a controlled narcotic substance, cocaine base (Health & Saf. Code, § 11352, subd. (a)) (count 1). The jury also found that he had sold cocaine base within the meaning of section 1203.073, subdivision (b)(7). In accordance with the court's instructions, the jury returned the verdict form as to count 2 unsigned.[7]

At sentencing, the trial court struck Westbrooks's two prison priors. The court sentenced Westbrooks to eight years in prison, consisting of the middle term of four years on count 1, doubled because of Westbrooks's strike prior.

## III.

## DISCUSSION

### A. *The trial court did not violate Westbrooks's due process right to have his guilt determined beyond a reasonable doubt by instructing the jury pursuant to CALCRIM No. 220*

Westbrooks claims the trial court violated his due process right to have his guilt determined beyond a reasonable doubt in instructing the jury pursuant to CALCRIM No. 220. Westbrooks argues that the instruction improperly

---

[6] Section 1203.073 and section 11370 limit the granting of probation when a defendant has been convicted of various enumerated offenses.

[7] The court had previously instructed the jury that count 2 was a "lesser offense" of count 1.

"limited the jury's determination of reasonable doubt to the evidence *received* at trial and precluded it from considering the lack of physical evidence tying [him] to the offense, namely the marked $20 bill and the other 'ten-plus' pieces of crack cocaine . . . possessed by the seller." Westbrooks claims that his trial counsel provided ineffective assistance of counsel by failing to object to the instruction.

"The independent or de novo standard of review is applicable in assessing whether instructions correctly state the law . . . ." (*People v. Posey* (2004) 32 Cal.4th 193, 218 [8 Cal.Rptr.3d 551, 82 P.3d 755].)

### 1. *Factual and procedural background*

During the trial, Officer Chavez testified that he searched Westbrooks after he arrested him. Officer Chavez said that he did not find any $20 bills or any rock cocaine in Westbrooks's possession or in the immediate area.

During closing arguments, both the prosecutor and defense counsel referred to the fact that Westbrooks did not have the marked $20 bill or rock cocaine in his possession when he was arrested. The prosecutor stated:

"'I've had a lot of difficulty in deciding how to argue this because the fact that the handful of rocks and the marked 20 is missing, I have lost just pieces of additional evidence, 'cause, remember, having the marked 20 there is circumstantial evidence [that] you [have] got the right guy or direct or circumstantial [*sic*]. If you got the marked 20, it just makes the case stronger. If you catch them holding a fistful of more drugs, it just makes the case stronger.

"I don't need it. I don't need it here. It would have been nice. And the fact that it doesn't exist is why we're in trial today. I don't need it."

Defense counsel argued that Westbrooks "did not have the money because they arrested the wrong guy." Defense counsel also stated, "There was no evidence of drugs or money on Mr. Westbrooks nor was any found in his immediate area." Defense counsel also argued, "Lack of evidence means reasonable doubt. . . . [¶] No drugs . . . . No money."

The trial court instructed the jury pursuant to a modified version of CALCRIM No. 220 as follows:

"The fact that a criminal charge has been filed against the defendant is not evidence that the charge is true. You must not be biased against the defendant just because he has been arrested, charged with a crime, or brought to trial.

"A defendant in a criminal case is presumed to be innocent. This presumption requires that the People prove each element of a crime and special allegations beyond a reasonable doubt. Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt.

"Proof beyond a reasonable doubt is proof that leads—leaves you with an abiding conviction that the charge is true. The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt.

"In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received throughout the entire trial. Unless the evidence proves the defendant guilty beyond a reasonable doubt, he is entitled to an acquittal and you must find him not guilty."

The court instructed the jury pursuant to CALCRIM No. 222 in relevant part as follows: "You must decide what the facts are in this case. You must use only the evidence that was presented in this courtroom . . . the sworn testimony of witnesses, the exhibits admitted into evidence, and anything else I told you to consider as evidence . . . ."

The trial court also instructed the jury, "You must decide whether a fact in issue has been proved based on all the evidence." (CALCRIM No. 223.) In addition, the court instructed the jury that the "People have the burden of proving beyond a reasonable doubt that it was the defendant who committed the crime" (CALCRIM No. 315), and that Westbrooks could "rely on the state of the evidence and argue that the People have failed to prove the charges beyond a reasonable doubt" (CALCRIM No. 355). The court also instructed the jury that "the People must prove" each element of the charged offense. (CALCRIM No. 2300.)

During deliberations, the jury sent the court a note that stated, "We would like more clarification on a definition of reasonable doubt. We have read the instructions but would like a little more interpretation of reasonable doubt."

After discussing the note with counsel, the trial court responded, "This is the standard definition given in all criminal cases. Courts are discouraged from expanding on the definition. Please consider each word carefully and apply a common sense meaning to the terms. Thank you for your question."[8]

---

[8] The clerk's transcript states that the court's response was "agreed to by counsel."

## 2. *Governing law*

■ "[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." (*In re Winship* (1970) 397 U.S. 358, 364 [25 L.Ed.2d 368, 90 S.Ct. 1068].) Pursuant to the due process clauses of the Fifth and Fourteenth Amendments to the United States Constitution, "The prosecution bears the burden of proving all elements of the offense charged . . . and must persuade the factfinder 'beyond a reasonable doubt' of the facts necessary to establish each of those elements . . . ." (*Sullivan v. Louisiana* (1993) 508 U.S. 275, 277–278 [124 L.Ed.2d 182, 113 S.Ct. 2078], citations omitted.)

Reasonable doubt may arise from the evidence presented at trial or the " ' "lack of evidence." ' " (*Johnson v. Louisiana* (1972) 406 U.S. 356, 360 [32 L.Ed.2d 152, 92 S.Ct. 1620]; accord, *People v. Simpson* (1954) 43 Cal.2d 553, 566 [275 P.2d 31] ["The reasonable doubt prescribed by [former section 1096][9] may well grow out of the lack of evidence in the case as well as the evidence adduced"].)

■ In *Victor v. Nebraska* (1994) 511 U.S. 1 [127 L.Ed.2d 583, 114 S.Ct. 1239] (*Victor*), the United States Supreme Court considered whether jury instructions defining reasonable doubt in two criminal cases violated due process. The *Victor* court began its analysis by stating: "The beyond a reasonable doubt standard is a requirement of due process, but the Constitution neither prohibits trial courts from defining reasonable doubt nor requires them to do so as a matter of course. [Citation.] Indeed, so long as the court instructs the jury on the necessity that the defendant's guilt be proved beyond a reasonable doubt, [citation], the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof. [Citation.] Rather, 'taken as a whole, the instructions [must] correctly conve[y] the concept of reasonable doubt to the jury.' [Citation.]" (*Id.* at p. 5.)

---

[9] Section 1096 provides: "A defendant in a criminal action is presumed to be innocent until the contrary is proved, and in case of a reasonable doubt whether his or her guilt is satisfactorily shown, he or she is entitled to an acquittal, but the effect of this presumption is only to place upon the state the burden of proving him or her guilty beyond a reasonable doubt. Reasonable doubt is defined as follows: 'It is not a mere possible doubt; because everything relating to human affairs is open to some possible or imaginary doubt. It is that state of the case, which, after the entire comparison and consideration of all the evidence, leaves the minds of jurors in that condition that they cannot say they feel an abiding conviction of the truth of the charge.' " Section 1096 was amended in 1995 in ways not material to this issue.

The commentary to CALCRIM No. 220 states, "This instruction is based directly on Penal Code section 1096."

In rejecting the defendants' arguments that the reasonable doubt instructions at issue in *Victor* were unconstitutional, the court stated, "There is no reasonable likelihood that the jurors who determined petitioners' guilt applied the instructions in a way that violated the Constitution." (*Victor, supra,* 511 U.S. at pp. 22–23.)

### 3. *The trial court did not err in instructing the jury pursuant to CALCRIM No. 220*

Westbrooks claims that there is a reasonable likelihood that the jurors interpreted CALCRIM No. 220 as prohibiting them from considering the lack of physical evidence implicating him in the crime, in determining his guilt. Westbrooks places particular emphasis on the following sentence in CALCRIM No. 220, "In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received throughout the entire trial." He notes that CALCRIM No. 222 generally defines evidence as the testimony and exhibits offered at trial.

The sentence to which Westbrooks objects, like the remainder of CALCRIM No. 220, merely instructs the jury that it must consider only the evidence presented at trial in determining whether the People have met their burden of proof. In other words, this instruction informs the jury that the People may not meet their burden of proof based on evidence other than that offered at trial. The instruction does not tell the jury that it may not consider any perceived lack of evidence in determining whether there is a reasonable doubt as to a defendant's guilt. Further, the remainder of the instructions clearly conveyed to the jury the notion that the People had the burden of proving Westbrooks's guilt beyond a reasonable doubt and that the jury was required to determine whether the People had met their burden of proving all of the facts essential to establishing his guilt.

We reject Westbrooks's argument that *People v. McCullough* (1979) 100 Cal.App.3d 169 [160 Cal.Rptr. 831], supports his claim. In *McCullough,* after the jury asked a question regarding one of the elements of the charged offense, the trial court reconvened the jury and invited other questions from the jurors. (*Id.* at p. 180.) While the court was discussing the concept of reasonable doubt with the jury, one juror asked, "So then the doubt must arise from evidence?" (*Id.* at p. 181.) The trial court responded: "Well, I would answer that yes, if you are saying—if your question is—what is reasonable doubt—reasonable doubt is that state of the case which, after a comparison and consideration of all of the evidence—that is the evidence introduced in the trial—after a comparison and consideration of all of the evidence, leaves the minds of the jurors in that condition that they cannot say

they feel an abiding conviction of the truth of the charge." (*Ibid.*) The *McCullough* court concluded that the trial court had "misled" the jury by telling it that the " 'doubt must arise from the evidence,' " because reasonable doubt may arise from the lack of evidence in a case. (*Id.* at p. 182.)

Unlike in *McCullough*, the trial court in this case did not tell the jury that reasonable doubt must arise from the evidence presented at trial, and, given the court's other instructions, it would not have been reasonable for the jury to interpret CALCRIM No. 220 as stating that the jury was precluded from considering any perceived lack of evidence in determining Westbrooks's guilt.[10] (See *Victor, supra*, 511 U.S. at pp. 22–23 [rejecting defendant's argument that reasonable doubt instruction violated constitutional rights where there was "no reasonable likelihood that the jurors . . . applied the instructions in a way that violated the Constitution"].)

█ Accordingly, we conclude that in instructing the jury pursuant to CALCRIM No. 220, the trial court did not violate Westbrooks's due process right to have his guilt determined beyond a reasonable doubt. In light of our conclusion that the trial court did not err in instructing the jury pursuant to CALCRIM No. 220, we conclude that defense counsel was not ineffective for failing to object to the trial court's giving of the instruction. (See *People v. Slaughter* (2002) 27 Cal.4th 1187, 1222 [120 Cal.Rptr.2d 477, 47 P.3d 262] [finding no ineffective assistance where defense counsel reasonably could have concluded that requesting jury instruction would have been futile].)[11]

B. *The trial court did not abuse its discretion in refusing to strike Westbrooks's prior strike conviction**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[10] We thus need not consider the effect of the fact that, in this case, there *was* evidence regarding the lack of physical evidence indicating that Westbrooks committed the offense, in the form of Officer Chavez's testimony regarding the fact that Westbrooks had neither drugs nor the marked $20 bill in his possession when he was arrested.

[11] While this appeal was pending, the court, in *People v. Hernández Ríos* (2007) 151 Cal.App.4th 1154, rejected a defendant's claim that "language in CALCRIM 220 . . . requiring the jury 'to compare and consider all the evidence' impermissibly shifts the burden of proof to the defense by allowing the jury to hold against the defense the absence of defense evidence." *Hernández Ríos* is consistent with our opinion in this case.

*See footnote, *ante*, page 1500.

## IV.

## DISPOSITION

The judgment is affirmed.

Benke, Acting P. J., and Huffman, J., concurred.

Appellant's petition for review by the Supreme Court was denied September 12, 2007, S154613.